BOURDIN, J.
In August 1850, one James Adie, a native of Scotland, and stonemason by trade, died near Hanover Junction, in Hanover county, where he was engaged in stone work on the Rouisa railroad, now the Chesapeake and Ohio railroad. He died intestate, unmarried, and without known descendants; and under proceedings instituted by the attorney for *the commonwealth of Hanover county, his estate was declared derelict, and es-cheated to the commonwealth for the benefit of the literary fund.
Under the decree in the cause, the administrator, on the 8th day of November 1860, paid into the public treasury the sum of six thousand dollars in part of the decree; and on the 1st of August 1863 the further sum of seven hundred and fortj'-eight dollars and one cent, balance in full.
On the 5th of August 1872 the appellants filed their petition in the Circuit court of the city of Richmond against the auditor of public accounts, the second auditor, and the board of education, as successor of the board of the literary fund, claiming to be heirs at law and next of kin of the said James Adie, deceased, and praying that the sums of money paid into the public treasury as aforesaid be paid over to them according to their respective rights.
The defendants answered the petition, denying the right of the plaintiffs to recover the money claimed in their petition on several grounds, which will be seen in the answer.
Testimony was taken in writing, both in Scotland and in this country, and the case coming on to be heard on the pleadings, exhibits and'evidence, the petition was dismissed with the costs. From this decree *539 the petitioners have appealed to this court.
We do not understand that any question of law has heen seriously pressed in the cause ; none certainly in the argument. The question discussed, and on which the case rests, is one of fact merely, viz: whether the James Adie who died near Hanover Junction, in Hanover county, Virginia, in August 1850, was the same person with one James Eadie who was born in the parish of Dumblane and count of Perth, in Scotland, *on the 28th of February 1807, under whom the appellants claim?
The onus is on the appellants to establish the affirmative to the satisfaction of the court. Have they done so?
My ox>inion is that they have, with as near an approach to absolute certainty as could be expected or reasonably required in such a case.
Without going into a minute examination of the testimony, I will merely notice in a very general way some of the facts which lead my mind to this conclusion — beginning with the American testimony. That shows that James Adie, the decedent, was a Scotchman, a stonemason by trade, between forty and fifty years of age at his death, and described by some of the witnesses as of medium height, and by others as taller; described by witnesses who knew him about the time of his death as being inclined to be fleshy, but by Tait, who knew him in 1836, as a spare but well developed man, five feet ten or five feet eleven inches high, fair complexion and light hair, and a scar or mark on one cheek. Came from New York to Washington; was there with one Robert Brown, builder, in 1834, and subsequently from 1837 to 1842; and afterwards came to Virginia to work on the Virginia railroads, and died; as we have seen, at Hanover Junction in August 1850, intestate, unmarried, without known descendants, and without kin or claimants to his estate in America, so far as we know, except the claimants from Chicago, who are appellants.
Most of the witnesses in America speak of the decedent as James Adie; but Tait, a ver3r intelligent witness, who knew him well, and as far back as 1836, says he generally spelled his name Eadie, sometimes Adie.
*Such was the James Adie or Eadie who died in Virginia in 1850. How is he identified with the James Eadie or Adie who was born at Stone Hill Dumblane parish, Perth county, Scotland, under whom appellants claim?
They prove beyond all doubt, by written and documentary evidence, that they are the children and descendants of one James Eadie, farmer, who lived at Stone Hill, Dumblane parish, in the county of Perth, Scotland. By the register of the births and baptisms of all the children of said Janies Adie, duly certified by the parish clerk and by the depositions of witnesses, the appellants are proved beyond controversy, to be the surviving children and descendants of said James. By the same register it appears that on the 28th of February 1807, “James, son to said James Eadie, farmer at Stone Hill,” was “born”; “and baptized 15th March 1807.” And this is the James under whom the appellants claim. The decedent is proved by the witnesses to have been apparently between forty and fifty years of age at his death; none placing it as low as forty or as high as fifty. The appellants’ relative, James Eadie, would have been, in August 1850, in his forty-fourth j’ear. James Eadie, of Stone Hill, at the age of twenty-three, when he left Scotland for New York, in the year 1830, was a spare and thin young man about five feet ten or five feet eleven inches high, with fair hair, fair complexion, and a mark or scar on one side of his face. We have no witness that describes the Hanover Adie a s early as 1830. He was then in New York, and in 1834 came to Brown, in Washington, whose letter does not describe him. But in 1836 Tait became well acquainted with him, and thus describes him: “I should think he was about twenty-five to thirty years of age when I knew him. *'( The Perth Adie would be twenty-nine.) He was a man about five feet ten inches, or perhaps five feet eleven inches, light hair, a fiat face, a spare but well developed man. I have a recollection that he had some peculiar mark on one of his cheeks; whether it was a scar, burn or natural mark, I am unable to say. I am sure he had some such mark on one of his cheeks.” “He was a Scotchman.” This answers, in almost every particular, the descriptions by the Scotch witnesses of the Scotch Adie. The latter was trained a stonemason in Edinburgh, and went from that place to New York in 1830. The Hanover Adie was a stonemason — came from New York in 1834, to Brown, in Washington, and worked with him as a mason.
It is objected, however, by the attorney general that the Hanover Adie and the Scotch Adie cannot be the same, because Brown in his letter says that the James Adie -who worked with him and died at Hanover Junction told him that his mother and sisters were in Edinburgh, “whilst the Scotch witnesses place the Eadie family at Dumblane, in Perth, and nowhere else.”
The attorney general is under a misapprehension in two respects: first, in supposing that the Hanover Adie used the word “sisters”; secondly, in saying the Eadie family were placed by the witnesses at Dumblane, Perth, and nowhere else. In the statement made to Brown the word “sister” was used and not “sisters.” He told Brown in 1834 that “his mother and sister” were in Edinburgh. There is no other proof in the record at all as to the mother’s residence in 1834 and subsequently; but it does incidentally appear that the youngest living and only unmarried sister of said James Eadie — Isabelle Eadie — was then living in Edinburgh, and had been for some time; and *that she died there in 1838. This latter fact is incidentally stated by Marion Dawson, her sister, in giving a general history of the family. It does not appear when she moved *540 to Edinburgh, but that she was living' in Edinburgh as far back as October 1833, appears from a letter of hers of that date to her brother-in-law and said .sister Marion. It is apparent from this letter that this youngest living sister, Isabelle, was living in Edinburgh in October 1833, and had been living there for some time past; and it is further proved, as we have seen, that she died there in 1838. The statement made to Brown then, that the “sister” was living in Edinburgh in 1834, is strictly accurate; and there is literally nothing in the record to impugn it as to the mother.
It is not invalidated by the erroneous statement that the Eadie family were placed at Dumblane, Perth. Their original homestead and births were there, but in progress of time and in the ordinary course of nature they were dispersed. Isabelle certainly lived in Edinburgh for some time prior to 1833, and died there in 1838. James, her youngest brother, acquired his trade there, lived there, working at it for several years, and in his twenty-fourth year went from Edinburgh to New York. Here are two of the family certainly traced to Edinburgh, and the residence of the mother, at that late period, is not otherwise known than bj' the statement of James to Brown, commented on by the attorney general. Erom the letter of Isabelle, already referred to, it would seem probable that she was then not at Stone Hill, but with her daughter, Mrs. Dawson, whether as a resident, or visitor merely, does not appear. As the old home was broken up, nothing would seem more natural than a desire on the mother’s part to be near her youngest surviving daughter, ^especially when we see that this daughter was unmarried. I see nothing in the statement to Brown to weaken the claim of appellants; but, on the contrary, much to sustain it.
Much reliance has been placed on the different spelling of the name. We should attach but little importance to the dropping of a single letter in the spelling of a name were the spelling uniform in one way in Virginia, and uniform the other way in Scotland. Such changes are too common to be of much weight in questions like that before us. But the spelling of the name in this case is not uniform in either country. Whilst the Scotch parochial register shows that the old people spelt the name ‘ ‘Eadie, ’ ’ the surviving son, Archibald, spells his name Adie, and one of the daughters uses both.
And as to the name in America, we learn from the witness Tait that whilst James Adie sometimes might have spelt his name Adie, yet when he knew him he generally spelt it Eadie. This witness, it will be observed, knew him at a much earlier period than that deposed to by the Virginia witnesses — only six years after he left Edin-burg' — who generally call him Aflie. I am of opinion, 'therefore, that the diversity in the spelling of the name existed in both countries, and no importance should be attached to it.
I have reviewed the testimony in the; cause in a general way; but as the question is purely a matter of fact, at greater length than is my habit.
There is no conflict in the testimony. Indeed, it is conceded by the attorney general that it was all one 'way, and no case for an issue; and such is my opinion. It is for this, court, then, to pass on its sufficiency to establish the appellants’ claim. And my opinion is, that it does establish, beyond all reasonable doubt, that *the James Eadie, stonemason, who was-born at Stone Hill, Dumblane parish, Perth county, Scotland, and left Edinburgh for New York in 1830, was the same James Adie, stonemason, who died at Hanover Junction, Hanover county, Virginia, in August 18S0; and that the appellants have clearly shown themselves to be the next of kin of said Adie. The claim of the appellants against the state should, in my opinion, have been established; and the decree of the Circuit court, dismissing their petition, is therefore erroneous, and should be reversed and annulled, and a decree entered in accordance with this opinion.
The other judges concurred in the opinion of Bouldin, J.
Decree reversed.